**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Ryan Companies US Inc.,                                    Civil No. 14-3207 (DWF/BRT)

                Plaintiff,                         (REDACTED)

v.                                                                      **MEMORANDUM**
                                                                        **OPINION AND ORDER**
Everest National Insurance Company,

                Defendant.

---

Daniel J. Brown, Esq., Jocelyn L. Knoll, Esq., Peter J. Shaw, Esq., and Sydney H. Crowder, Esq., Dorsey & Whitney LLP, counsel for Plaintiff.

Charles E. Spevacek, Esq., and Joel T. Wiegert, Esq., Meagher & Geer, PLLP, counsel for Defendant.

---

**INTRODUCTION**

    This matter is before the Court on Plaintiff Ryan Companies US Inc.'s ("Ryan")

Motion for Summary Judgment (Doc. No. 21) and Defendant Everest National Insurance

Company's ("Everest") Motion for Summary Judgment (Doc. No. 28). For the reasons

set forth below, the Court denies both motions.

**BACKGROUND**

    This insurance coverage dispute arises from a 2010 electrical overheating incident

at the Target Technology Center ("TTC"), a large data center in Brooklyn Park,

Minnesota, and resulting corrective work completed following the incident. (*See* Doc.

No. 25 ("Cairl Decl.") ¶¶ 2-3, 7.) ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████   (*See* Doc. No. 31 ("Weigert Aff.") ¶ 2, Ex. 1 at 111-12; Weigert Aff.

¶ 3, Ex. 2 at 90.)  Ryan was the design/builder of the TTC.  (Cairl Decl. ¶ 3.)

## I.   Policy Provisions

Ryan was insured under an insurance policy from Zurich American Insurance

Company ("Zurich"), Policy Number GLO 9379578-05, from March 31, 2009 to

March 31, 2010.  (Doc. No. 24 ("Brown Decl.") ¶ 2, Ex. A.)  The Zurich Policy had a

coverage limit of $2 million per occurrence.  (*Id.* at 379.)[1]  Ryan was also insured under a

Commercial Excess Liability Policy issued by Everest, Policy Number 71C6000232-091,

from March 31, 2009 to March 31, 2010.  (Brown Decl. ¶ 3, Ex. B.)  The Everest

Policy's limit was $10 million.  (*Id.* at 44.)

The Everest Policy covers excess liability and provides that Everest "will pay on

behalf of the insured the amount of the 'ultimate net loss' in excess of the 'underlying

limits of insurance' to which this insurance applies."  (*Id.* at 46.)  "Ultimate net loss" is

defined as follows:

> "Ultimate net loss" means the total sum, after reduction for recoveries,
> salvages collectible and "other insurance", that the insured becomes legally
> obligated to pay as damages under this policy by reason of settlements,
> judgments, arbitration or other alternate dispute method entered into with
> our consent or the "underlying insurer's" consent.

(*Id.* at 53.)

---

[1]   For ease of reading, the Court omits all leading zeros and bates stamp designations
in the pagination of exhibits cited by the parties.

Regarding coverage, the Everest Policy "[f]ollow[s] the terms, definitions, conditions and exclusions that are contained in the 'first underlying insurance', unless otherwise directed by [the] policy. . . ." (*Id.* at 46.)  The Everest Policy also explains that its coverage will "[n]ot be broader than that provided by the 'first underlying insurance'." (*Id.*)  The "first underlying insurance" to which the policy refers is the Zurich Policy. (*See id.* at 52, 55.)  Thus, the terms of the Zurich Policy control the scope of available coverage in this case.

As relevant to this coverage dispute, the Zurich Policy states:  "We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  (Brown Decl. ¶ 2, Ex. A at 380.) The Zurich Policy covers property damage that is "caused by an 'occurrence' that takes place in the 'coverage territory,'" and the property damage must occur during the policy period.  (*Id.*)  "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property. . . ; or [l]oss of use of tangible property that is not physically injured. . . ."  (*Id.* at 394.)  "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id.* at 393.)

## II.    The TTC and the January 2010 Overheating Incident

In 2000 and 2001, Ryan was hired by Target as the design/builder of the TTC. (Cairl Decl. ¶ 3.)  In this role, Ryan hired additional companies to participate in the project.  Ryan hired Ellerbe Becket as the architect/engineer of record and Parsons Electric as the electrical subcontractor.  (*Id.* ¶ 4.)  In 2004 and 2005, Ryan and these same

3

companies also participated in making upgrades to the TTC.  (*Id.* ¶ 5.)  The electrical

system at the center of this coverage dispute was supplied and constructed by Parsons

Electric.  (*Id.* ¶ 6.)

In January 2010, the overheating incident at the TTC was discovered when an

employee bent over to tie his shoe and felt heat coming through the floor.  (Brown Decl.

¶ 4, Ex. C at 71.)  After investigating the situation, Target discovered that wiring in the

electrical system had "[b]urnt to a crisp on a lot of areas."  (*Id.* at 74.)  Subsequent

"megge[r]" testing revealed that wiring throughout the system had insufficient insulation.

(*Id.* at 72-73.)  In response to this overheating incident, Target and Ryan immediately

sought to repair the TTC's electrical system.  (Cairl Decl. ¶ 8.)

Ryan considers the following facts regarding the details of the overheating

incident and the subsequent repairs to be immaterial to the present motions.  (*See* Doc.

No. 23 at 4.)  However, because these facts are central to Everest's theory of the case, the

Court states them for completeness here.  ████████████████████████████

████████████████████  (Wiegert Aff. ¶ 4, Ex. 3 ¶ 27.)  ██████████

Feeder 1-1A ("Feeder 1A"),  ████████████████████████████████████

████████████████  (Wiegert Aff. ¶ 5, Ex. 4 at 929.)  █████████████████

("Feeder 1B"),  ██████████████████████████████████████████

████████  (*Id.*)  ██████████████████████████████████████████

████████████████████  (*Id.*)  A Target maintenance mechanic described the UPS-1 and

UPS-2 components as "kind of like two plants, two generator plants."  (Wiegert Aff. ¶ 2,

Ex. 1 at 28.)  ████████████████████████████████████

(Wiegert Aff. ¶ 5, Ex. 4 at 929.) 

(*Id.*) (*Id.*)

(*Id.*)  Megger testing

of the feeders running to UPS-2 showed that "the insulation on the feeders had probably

degraded substantially."  (Wiegert Aff. ¶ 3, Ex. 2 at 72.)  Although the transformer had

not failed, Target decided not to reenergize the damaged feeders running to UPS-2.  (*Id.*

at 72-73.)  When the wires were pulled from the feeder to UPS-2, "[t]here were areas

where the insulation had degraded to the point where copper was visible, cracked, black."

(*Id.* at 74.)  About one-half to one-third of the wires were damaged, and the damage was

primarily in the middle of the wires.  (*Id.* at 74-75.)  The damage to these wires also

caused the build-up of a white powdery residue on the floor and equipment in the UPS-2

room.  (*Id.* at 68; *see also* Wiegert Aff. ¶ 11, Ex. 10 at 80-82.)

Parsons Electric also conducted megger tests on Feeder 1A after the overheating

incident but "had no concerns for reenergizing those cables" because testing revealed

"sufficient insulation when they were megged."  (Wiegert Aff. ¶ 9, Ex. 8 at 146-48; Doc.

No. 41 ("Wiegert Aff. II") ¶ 2, Ex. 32 at 149.)  There was no evident thermal damage to

the Feeder 1A/UPS-1 wires.  (Wiegert Aff. ¶ 8, Ex. 7 at 144-47.)[2]  According to Ryan's

---

[2]      The following excerpts from the deposition of James Todd, an engineer at Ryan
Companies, illustrate the findings with respect to the condition of the Feeder 1A/UPS-1
wires:

(Footnote Continued on Next Page)

vice-president of construction, Ryan was unaware of any physical damage at the TTC

other than the damaged UPS-2 feeders and the white dust in the UPS-2 room.  (Wiegert

Aff. ¶ 11, Ex. 10 at 87-88; Cairl Decl. ¶ 1.)

### III.    Repair and Remediation Following the Overheating Incident

An engineering firm, EYP, conducted thermal calculations on the TTC's electrical

system to determine which feeders needed to be replaced following the overheating

---

(Footnote Continued From Previous Page)

Q.  And did you see any evidence of heat damage on the UPS1 wires?
A.  Given the samples and the sample size that I was shown, no.
. . .
Q.  . . . [T]he wires that were pulled, at least the ones you looked at on the
UPS1 side, you didn't see any evidence of thermal damage?
A.  No, I didn't.  But again, I want to stress that the sample size I was given
was pretty small.  It very well could have been.  I don't know.
. . .
Q.  . . . Did anybody at Parsons report back to anybody at Ryan that they
saw evidence of thermal damage on the UPS1 wires that were pulled?
MS. KNOLL:  Objection, form, foundation.
THE WITNESS:  Not that I recall.
. . .
Q.  . . . [W]ould it be fair to say that what you know of personal
observations of wires pulled from UPS1 and from [the meggering data] that
there was no evidence of heat damage on that side of the system?
MS. KNOLL:  Objection, form.
THE WINESS:  I would say based on that, it appears to be that way, but I
wouldn't consider that conclusive.

(Wiegert Aff. ¶ 8, Ex. 7 at 145-47, 174-75.)  David Mahoney, a Target maintenance
mechanic, provided similar testimony during his deposition:

Q.  Any heat-damaged-appearing wires that were pulled from UPS1?
A.  Not that I saw.

(Wiegert Aff. ¶ 2, Ex. 1 at 118.)

incident.  (Wiegert Aff. ¶ 3, Ex. 2 at 106-07.)  Each feeder was individually inspected to

determine if the feeder could sustain the loads anticipated in the original project

specifications.  (*Id.* at 84-85.)  Target relied on EYP's calculations to determine the scope

of remedial work it would undertake at the TTC.  (*Id.* at 143-44; *see also* Doc. No. 36

("Brown Decl. II") ¶ 3, Ex. R at 85-92.).)  Target's goal was "to make sure that the data

center did not experience another overheating incident[.]"  (Wiegert Aff. ¶ 3, Ex. 2 at

146.) ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████  (Wiegert Aff. ¶ 14, Ex. 13 at 1641-42; *see also* Wiegert Aff. ¶ 16, Ex. 15 at

740 ("Ryan did repair feeders other than the one which burnt up.  That work was done to

avoid another occurrence, which could have been much more costly."); Wiegert Aff.

¶ 17, Ex. 16 at 9 ("The repair work carried out by Ryan . . . included the replacement of

property damaged in the overheating and some additional work to prevent a future

overheating incident.").).)[3]

In June 2010, Ryan completed Phase I of the repair work, and feeders running into

both the UPS-1 and UPS-2 rooms were moved from underground and run overhead.

(Wiegert Aff. ¶ 10, Ex. 9 at 53-55.) ████████████████████████████████████████

████████████████████████████████████████████████

---

[3]     Ryan took the position that fewer feeders needed to be replaced in response to the
overheating incident, but EYP recommended additional feeders be replaced based on its
engineering analysis.  (Brown Decl. II ¶ 3, Ex. R at 91-92.)

███████████████████████████████████████████████████████████

███████ (*Id.* at 57-58; Wiegert Aff. ¶ 23, Ex. 22.)  Phase II also included the replacement

of fan coils and circuit breakers.  (Wiegert Aff. ¶ 10, Ex. 9 at 58, 63-64.)  ████████

██████████████████████████████  (*See* Wiegert Aff. ¶ 23, Ex. 22.)  In accounting

for the corrective work, Ryan did not track the respective costs of the different feeders

being repaired or replaced.  (*See* Wiegert Aff. ¶ 18, Ex. 17 at 2 ("Ryan's project

accounting did not track all costs so as to fit within categories created by Everest years

after the fact.").)

## IV.   The Target Settlement and Ryan's Attempts to Recover Amounts Due

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████  (Brown Decl. ¶ 5, Ex. D.)  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

██████ (*Id.*)  ████████████████████████████████████████

███████████████████████████████████  (*Id.*)  ██████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████  (*Id.*)  ████████

8



(*Id.*) (Brown Decl. ¶ 6, Ex. E.) (*Id.*) (*Id.*) (Brown Decl. ¶ 7, Ex. F.)

(Brown Decl. ¶ 8, Ex. G at 750.)  At the same time, Zurich "reserved its rights under any or all relevant provisions contained in the Zurich policy for those damages not covered as property damage under the policy."  (*Id.* at 750-51.)  Zurich noted that it was seeking the input of an independent expert to determine which damages would be covered, and explained:

> [I]f Ryan agrees to settle with Target on whatever terms are currently being contemplated, Ryan should recognize that Zurich does not view the settlement as only covering damages that could be covered under the Zurich policy.  If Ryan disagrees, Ryan will have the burden of establishing that the amounts incurred or paid under the settlement were for damages that are in fact covered under the Zurich policy.

(*Id.* at 751.) (Brown Decl. ¶ 10, Ex. I.)  Everest explained, "If Ryan chooses to enter into the settlement, it will merely continue to carry the risk that insurance coverage may not be available for the entire settlement payment."  (*Id.*)



(Brown Decl. ¶ 11, Ex. J at 3.)

(*Id.* at 2.)

(*Id.*)

(*Id.* at 5.)[4]  According to Ryan, it "would not have

settled with Target but for the overheating incident causing property damage.  The Target

Settlement was not meant to pay Target for repair costs of any particular claim, conduit

---

[4]

(Brown Decl. ¶ 11, Ex. J at 6.)

or feeder, but rather was a settlement of all claims Target threatened, had or may have had." (Cairl Decl. ¶ 12.)

Zurich ultimately paid $2 million to Ryan toward the Target Settlement. (Cairl Decl. ¶ 13.) Ryan and Parsons Electric also entered into a settlement agreement whereby Parsons Electric agreed to pay Ryan $2 million toward the Target Settlement. (*Id.* ¶ 14.) Ryan pursued a claim against Ellerbe Becket to a jury verdict and ultimately obtained around $1.4 million plus interest from Ellerbe Becket to contribute to the Target Settlement. (Brown Decl. ¶ 12, Ex. K; Brown Decl. ¶ 13, Ex. L; Cairl Decl. ¶ 16.) In the Ryan-Ellerbe Becket litigation, the jury concluded that Ryan, Ellerbe Becket, and Parsons were all negligent and that such negligence was a direct cause of the 2010 TTC overheating incident. (Brown Decl. ¶ 12, Ex. K.) The jury also found the $7 million value of the Target Settlement to be reasonable. (*Id.*) Although Zurich contributed to a portion of Ryan's litigation expenses, Ryan claims $251,061 of unreimbursed expenses for obtaining these recoveries from Parsons and Ellerbe Becket. (Brown Decl. ¶ 14, Ex. M; Brown Decl. ¶ 17, Ex. P at 4.) Everest did not participate in the litigation against Parsons or Ellerbe Becket. (Cairl Decl. ¶ 18.)

On November 15, 2013, Ryan contacted Everest to inform Everest of its purported responsibility under the excess policy to cover the remaining $1.6 million toward the Target Settlement. (Wiegert Aff. ¶ 29, Ex. 28.) On December 19, 2013, Everest responded with its position that no coverage would be available to Ryan because there would be no covered loss in excess of Zurich's payment. (Wiegert Aff. ¶ 30, Ex. 29 at

1.)[5]  Specifically, Everest asserted that only the repairs associated with the damage to

Feeder 1B would be covered, and Everest invited Ryan to submit additional information

which "suggests the costs associated with replacing feeder 1B do exceed the underlying

policy limit and deductible."  (*Id.* at 2.)

On July 28, 2014, Ryan commenced this litigation in Hennepin County,

Minnesota.  (Doc. No. 1, Ex. 1 ("Compl.").)  On August 19, 2014, Everest removed the

action to this Court.  (Doc. No. 1.)  Ryan seeks a judgment against Everest in excess of

$1.8 million.  (Compl. at 7.)  Both parties now move for summary judgment.  (Doc.

Nos. 21 & 28.)

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of London*, 574 F.3d

885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

---

[5]      Everest had previously taken a similar position, notifying Ryan on October 28, 2010 that Ryan may not be covered under the Everest Policy for the damages incurred relating to the TTC electrical system.  (Brown Decl. ¶ 9, Ex. H.)  Everest explained, "A review of our policy along with the coverage position issued by your General Liability insurer . . . Zurich, reveals that the damages may not fall within the coverage of your General Liability insurance policy."  (*Id.* at 749.)

determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.      Ryan's Motion for Summary Judgment

Ryan argues that under the terms of the Zurich policy—and consequently under Everest's excess policy—coverage exists for the entire $7 million settlement agreement. (Doc. No. 23 at 8-11.)  Specifically, Ryan identifies five elements from the Zurich policy's "property damage" clause to explain that coverage exists for:  (1) sums Ryan is legally obligated to pay as damages (including settlements) because of (2) property damage (3) caused by an occurrence (4) in the coverage territory (5) during the policy period.  (*Id.* at 9.)  Ryan claims that "the repair work and consequent Target Settlement . . . are covered as consequential damages" under Minnesota law and the relevant policy language.  (Doc. No. 39 at 5-6.)

### A.      The Target Settlement

Ryan argues that the $7 million settlement is covered because it was an amount Ryan became legally obligated to pay "because of" property damage.  (Doc. No. 23 at

9-11.)  Ryan asserts, "Ryan would not have settled with Target but for the overheating incident causing property damage."  (*Id.* at 10.)  Ryan suggests that under the Zurich policy "a settlement is just the sort of obligation upon which the 'legally obligated to pay' language of the insuring agreement is triggered."  (Doc. No. 35 at 5.)  In addition, Ryan points to the Everest policy's definition of "ultimate net loss" to support its position that the $7 million Target Settlement is covered in its entirety.  (*Id.* at 4.)  This definition states that "'Ultimate net loss' means the total sum, after reduction for recoveries, salvages collectible and 'other insurance', that the insured becomes legally obligated to pay as damages under this policy by reason of settlements. . . ."  (Brown Decl. ¶ 3, Ex. B at 53.)  According to Ryan, the "settlement" entered into by Ryan "expressly triggers [Everest's] liability" to indemnify Ryan in this matter.  (Doc. No. 35 at 5.)

Everest argues that Ryan cannot establish its damages by simply pointing to the $7 million settlement without "explain[ing] what that amount reflects."  (Doc. No. 38 at 1; *see also* Doc. No. 40 at 2 ("[T]here is no Minnesota case that holds that a settlement automatically establishes the amount of covered damages.").)  Everest argues, "[w]hile some of the Target Settlement amount was presumably incurred 'because of' the Feeder 1B 'property damage,' the entire settlement amount most certainly was not."  (Doc. No. 38 at 5.)  Everest suggests that the Target Settlement was a compromise relating to Ryan's liability for both the property damage its work caused and the costs to prevent a future occurrence.  (Doc. No. 40 at 3.)  In response to Ryan's consequential damages argument, Everest argues that Ryan has failed to explain how the $7 million settlement

14

amount is causally related to the property damage that occurred at the TTC.  (Doc. No. 38 at 9.)

"An insurer's duty to indemnify can be triggered by a settlement. . . .  However, . . . if indemnity is based on a settlement, then indemnity can be more difficult to analyze."  22 Britton D. Weimer, Clarance E. Hagglund, and Andrew F. Whitman, Minn. Prac., Insurance Law & Prac. § 3:2 (2015 ed.) (quotation marks and citation omitted). "[T]he settlement terms must include claims of the insured that enjoyed *actual coverage* in the insurer's policy; *potential coverage* would not be enough, because the insurer only contracted to defend and indemnify claims that are actually covered."  *Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014).  In other words, "[T]he settlement in the underlying action [must] include [] claims for risks [the insurer] agreed to assume."  *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Nat'l Chiropractic Mut. Ins. Co.*, 496 N.W.2d 411, 415 (Minn. Ct. App. 1993)).  A court may consider the events and circumstances leading to the settlement to determine what claims were settled. *St. Paul Fire*, 496 N.W.2d at 415.  However, an insured cannot establish its right to coverage simply by pointing to a settlement agreement.  *See Nelson v. Am. Home Assurance Co.*, 702 F.3d 1038, 1042-43 (8th Cir. 2012) (rejecting the insured's argument that "as a general principle, an insurer must provide coverage for its insured's settlements whether or not the plaintiff establishes coverage").

Ryan cites *Netherlands Insurance Co. v. Main Street Ingredients, LLC*, Civ. No. 11-533, 2013 WL 101876 (D. Minn. Jan. 8, 2013), to support its position that the settlement is covered under the policy as consequential damages flowing from covered

property damage.  (Doc. No. 23 at 11.)  In *Netherlands*, the insurer argued—like Everest

argues here—that "even if there was property damage, the damages from the settlement

are not covered."  2013 WL 101876 at *5.  Specifically, the insurer claimed that damages

including "destroyed inventory, credits and fees to customers, recall freight and

additional costs . . . are purely economic and not property damage."  *Id.*  The court

rejected this argument, explaining that "[t]he Policy . . . covers not only property damage,

but damages [the insured] must pay *because of* property damage."  *Id.*  The court stated,

"[a]lthough lost profits or other consequential damages do not constitute property

damage, they are sums for which [the insured may be] liable . . . because of . . . property

damage."  *Id.* (quoting *Reinsurance Ass'n of Minn. v. Timmer*, 641 N.W.2d 302, 314

(Minn. Ct. App. 2002)).  Notably, the *Netherlands* court did not characterize the

settlement itself as covered damages simply because the settlement followed an

occurrence that caused property damage.  Rather, the court discussed the type of damages

covered under the settlement—consequential damages—and deemed those damages to be

covered.  *Id.*

   In this case, Ryan asserts that the Everest Policy "protects Ryan not merely against

the 'property damage' *per se*, but against the reasonable <u>settlement</u> necessitated 'because

of' the property damage."  (Doc. No. 23 at 12.)  The Court finds this argument

unavailing.  Ryan cannot establish coverage over the entire settlement without first

establishing the nature of the damages included within the settlement.[6]



(Brown Decl. ¶ 11, Ex. J

at 3.)

(*Id.* at 5.)

(*Id.* at 2.)

As discussed in more detail below, the Court concludes that material fact disputes

remain regarding whether all such work was causally related to property damage that

occurred at the TTC.  Although the Court believes it is clear that at least some portion of

the settlement agreement included covered damages for which Ryan was legally

obligated to pay because of property damage caused by an occurrence, the Court does not

find that governing law or the record in this case indisputably support the conclusion that

the entire amount of the settlement agreement was covered under the Zurich and Everest

---

[6]      The Court also notes that the Everest's policy's reference to "settlements" in the
definition of ultimate net loss in no way alters the Court's conclusion on this issue.  (*See*
Brown Decl. ¶ 3, Ex. B at 53.)  The Everest policy states that its coverage will "[n]ot be
broader than that provided by the 'first underlying insurance'."  (*Id.* at 46.)  The mere
reference to "settlements" in a definition within the Everest policy cannot be read to
expand the coverage available based on the relevant terms of the Zurich policy.

policies.  The Court concludes that Ryan does not succeed as a matter of law based simply on the settlement agreement it entered into with Target.

**B.      Repair Work**

In the alternative, Ryan argues "even were one to focus on the repair work, rather than the Target Settlement, coverage still applies."  (Doc. No. 23 at 13.)  This is so, Ryan argues, because the repair work was causally related to the underlying property damage to the TTC's electrical system.  (*Id.*)

Ryan cites *Federated Mutual Insurance Co. v. Concrete Units, Inc.*, 363 N.W.2d 751 (Minn. 1985), for the proposition that the Zurich policy covers not only property damage but "all damages which are causally related to an item of 'property damage.'" (*See* Doc. No. 23 at 13; Doc No. 39 at 5 (quoting *Federated*, 363 N.W.2d at 757).)  In *Federated*, the Minnesota Supreme Court explained that "[the insurer] may . . . become obligated to . . . indemnify its insured against claims for consequential damages since [the insurer] is required 'to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as *damages because of property damage*.'"  363 N.W.2d at 757.  Indeed, as Ryan correctly notes, the court interpreted the phrase "damages because of property damage" to mean "all damages which are causally related to an item of 'property damage' which satisfies either of the policy's definitions." *Id.*  The Minnesota Supreme Court then went on to analyze whether the claimed damages were causally related to the specifically-identified property damage covered under the policy. *Id.*  The court found that the cost of replacing defective concrete, interest expense, and lost profits were not covered damages because they were "not causally related" or "too

tenuously related to [the covered property damage] to be recoverable as consequential damages." *Id.*

Ryan also relies on *Westfield Insurance Co. v. Weis Builders, Inc.*, Civ. No. 00-987, 2004 WL 1630871 (D. Minn. July 1, 2004), to support its position that the repair work was causally related to property damage.  (Doc. No. 23 at 14.)  Construing identical policy language to the Zurich policy in this case, the court in *Westfield* explained, "the Court must determine whether there has been property damage, if that damage occurred during the policy period, if any exclusions or endorsements preclude coverage, and if there is coverage, what scope of coverage is provided by the phrase because of . . . property damage." *Westfield*, 2004 WL 1630871, at *2 (quotation marks omitted).  In determining the scope of coverage under the "because of property damage" clause, the court concluded that costs incurred to repair property damage and the costs of remedial work undertaken "in response to claims made against [the insured] . . . relating to property damage that was occurring in various sections of the Development" were causally related to property damage and thus covered.  *Id.* at *8.  In *Westfield*, the court relied on expert reports to conclude that there was "no genuine issue of material fact with respect to whether the water penetration [which caused the property damage] is continuous." *Id.* at *4.

Whether the damages in question are "causally related to an item of 'property damage'" is a fact issue dependent on the specific circumstances of a given case. *See Sand Cos., Inc. v. Gorham Housing Partners III, LLP*, No. A10-113, 2010 WL 5154378, *4 (Minn. Ct. App. Dec. 21, 2010) (declining to disturb the district court's factual finding

that a retrofit to a sprinkler system was causally related to damage from several pipe breaks).

In this case, the Court concludes there are genuine issues of material fact regarding the proper scope of coverage given Ryan's extensive repairs and remedial work.  As discussed further below with respect to Everest's Motion for Summary Judgment, Everest contends that the only repairs that are causally related to an item of property damage are those undertaken with respect to the particular feeder that overheated in January 2010. Ryan, on the other hand, asserts that all of the corrective work was causally related to the property damage that took place at the TTC.  Because this material fact issue is genuinely disputed by the parties in this case, the Court concludes that summary judgment in Ryan's favor is not warranted.

## III.   Everest's Motion for Summary Judgment

Everest's Motion for Summary Judgment focuses on the precise nature of the property damage to the TTC's electrical system and the resulting corrective work completed by Ryan.  In contrast with Ryan's broad claims about property damage and its causal relation to all of the repairs undertaken at the TTC, Everest focuses on discrete items of property damage to argue that only certain repairs are covered.  Specifically, Everest claims that the Zurich policy's "property damage" clause only covers the damages related to Feeder 1B and the white powdery residue in the UPS-2 room.  (Doc. No. 30 at 15.)  Everest suggests that any portion of the corrective work which is deemed "preventative work" to prevent another overheating incident is not covered.  (*Id.* at 16.) Viewing the facts in this light, Everest argues that it is entitled to summary judgment

because Ryan cannot meet its burden of proving coverage by allocating the $7 million settlement between covered and uncovered damages.

Everest argues, "[b]ecause Ryan cannot attribute any cost to the repair/replacement of Feeder 1B or the UPS-2 equipment—the covered damages—it cannot meet its burden of demonstrating that the Everest Policy applies to this matter." (*Id.* at 17.) Everest suggests that Ryan has the burden to establish what portion of the settlement is properly allocated to covered damages. (Doc. No. 38 at 6.) Everest also notes that both Everest and Zurich alerted Ryan to the allocation issue before Ryan entered into the Target Settlement, suggesting that the entire $7 million amount may not be covered under the respective policies. (Doc. No. 40 at 5.) Ultimately, Everest contends, "Ryan's inability to allocate the Target Settlement amount to those costs pertaining to the property damage to Feeder 1B and the UPS-2 room equipment is fatal to its claim." (Doc. No. 38 at 7.)

Ryan argues that allocation of the specific amounts included in the settlement is not relevant to this dispute because "[a]llocation typically arises when there are multiple claims, some of which are covered, and some of which indisputably are not." (Doc. No. 39 at 7-8.) Ryan argues that this case involves only one claim—Target's demand which resulted in a settlement. (*Id.* at 8.) With regard to the facts at the center of Everest's coverage position, Ryan also asserts that "Everest has not carried its burden of demonstrating a lack of a triable issue of fact, much less proved that such facts must or even may—on this record—be resolved in favor of Everest." (Doc. No. 35 at 2.) Ryan argues that the ampacity and megger tests conducted at the TTC "demonstrate that the

electrical system was damaged. . . ."  (Doc. No. 39 at 7.)  In reply, Everest points out that

no feeders were tested and deemed to fail other than Feeder 1B.  (Doc. No. 40 at 9.)

Instead, Everest suggests, the other feeders were replaced due to thermal calculations

which suggested that they could fail in the future.  (*Id.* at 9-10.)  Everest emphasizes that

even if feeders other than Feeder 1B failed, "they did not cause 'property damage.'"  (*Id.*

at 11.)

A.     **Allocation of the Target Settlement**

An insured's failure to bring forward evidence to establish the proper allocation of

a settlement including covered and uncovered claims may result in a judgment in favor of

the insurer.  *See Bor-Son Bldg. Corp. v. Emp'rs Commercial Union Ins. Co. of Am.*, 323

N.W.2d 58, 64 (Minn. 1982).  This is so because it is the insured's burden to prove its

claim for reimbursement.  *Id.*  However, "an insured [may] seek indemnity for covered

claims despite the settling parties' failure to allocate between covered and uncovered

claims at the time of settlement."  *UnitedHealth Group Inc. v. Columbia Cas. Co.*

(*UnitedHealth I*), 941 F. Supp. 2d 1029, 1034 (D. Minn. 2013) (citing Minnesota cases in

which courts allocated a settlement between covered and uncovered damages).  "Under

Minnesota law, the court may interpret a settlement agreement and determine the

allocation of payments between claims which are insured and claims which are

uninsured."  *Covent of the Visitation Sch. v. Continental Cas. Co.*, 707 F. Supp. 412, 416

(D. Minn. 1989).  The allocation inquiry is ultimately an objective one.  *UnitedHealth*

*Group Inc. v. Columbia Cas. Co.* (*UnitedHealth II*), 47 F. Supp. 3d 863, 872 (D. Minn.

2014).  "The question for the jury is how would a reasonable person in the position of

[the insured] have allocated the [settlement amount] between [covered and uncovered claims] at the time that the Settlement was reached, in light of the information available to [the insured] at that time." *Id.*

In *UnitedHealth II*, the court explained:

> [T]here are essentially three types of evidence that a party may introduce to prove an allocation case.  A party may introduce evidence of how the settling parties and their attorneys valued the claims at the time of settlement; a party may introduce evidence of what was known to the parties and their attorneys at the time of the settlement and ask the jury to assess the settlement value of each of the claims based on that information; or a party may introduce expert testimony about the settlement value of the settled claims.

*Id.* at 881-82.  The court explained that the allocation issue may be based on relatively uncomplicated facts and law such as a slip-and-fall case in which "a lay jury may be able to act as the evaluator without guidance from either the settling parties or an expert witness."  *Id.* at 882.  However, the issue may also be more complicated.  In *UnitedHealth II* itself, for example, the court concluded that the jury would need the assistance of expert testimony to resolve the allocation issue because the insured sought "to present evidence that no lay jury would understand and to ask the jury to draw inferences that no lay jury would be capable of drawing."  *Id.* at 883.  Because the insured failed to put forward the necessary evidence to aid the trier of fact, the court found that the insured had failed to meet its burden and granted summary judgment in the insurer's favor.  *Id.* at 890.

The Court concludes that allocation of the Target Settlement between covered and uncovered damages is necessary in this case.  Notwithstanding Ryan's position that the

Target Settlement included only one claim, the Court concludes that the settlement

agreement covered several possible claims that Target could ultimately have asserted

against Ryan had the dispute proceeded to litigation. 

(Brown Decl. ¶ 11, Ex. J

at 5.)

(*Id.* at 6.)

Given this language, the Court concludes that the $7 million settlement figure could be

interpreted to include claims covered by the Zurich and Everest insurance policies—those

claims for damages that are causally related to property damage—as well as other

possibly uncovered claims.  Thus, allocation is required to establish the proper amount, if

any, to which Ryan is entitled under the Everest policy.

As noted in *UnitedHealth II*, allocation may be deemed an impossible task for a

lay jury if the evidence is beyond a jury's comprehension and requires inferences that lay

juries cannot be expected to make.  This was so in *UnitedHealth II* because allocating the

$350 million settlement would require a jury to value complex claims in two large class

action lawsuits.  *UnitedHealth II*, 47 F. Supp. 3d. at 866, 890 ("These were not

slip-and-fall cases; these were two extraordinarily complicated lawsuits that would be

difficult even for lawyers to comprehend.").  As the court explained, however, sometimes allocation is a simpler task—such as in a simple slip-and-fall case.  *Id.*  The Court concludes that this case falls somewhere in between these extremes.  Although neither party has provided expert testimony to aid a jury in understanding the scope of the repair work undertaken at the TTC, each party has pointed to record evidence which—if believed—could establish the causal connection (or lack thereof) between the property damage at the TTC and the subsequent corrective work.  To determine whether Ryan is entitled to collect excess insurance coverage from Everest, a factfinder must determine what portion of the $7 million settlement a reasonable person would have allocated to "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which [the Zurich policy] applies."  (Brown Decl. ¶ 2, Ex. A at 380.)

### B.   Material Fact Dispute

As noted above, Everest contends that Ryan's inability to establish the proper allocation of the $7 million settlement entitles Everest to summary judgment in its favor. On the record before the Court, the Court concludes that disputed issues of material fact remain, precluding summary judgment for either party.  If Everest's theory of the case is believed, a reasonable juror could agree that much of the corrective work undertaken by Ryan was not causally related to specific property damage.  However, viewing the record in the light most favorable to Ryan, the Court believes a reasonable juror could also find that the property damage to the TTC's electrical system was sustained to a greater extent than Everest claims.  Although Everest points to portions of the record that support its

position that Feeder 1B and the UPS-2 were the only components of the TTC that suffered property damage, the Court does not find that these facts so clearly illustrate Everest's position so as to grant summary judgment in Everest's favor.[7]

A factfinder could conclude that the damage incurred on one particular feeder was causally related to the repairs undertaken with respect to other feeders. A factfinder might also reasonably infer that the replacement of several feeders throughout the TTC based on thermal calculations was causally connected to the property damage to the TTC's electrical system. On the record before the Court, it is simply not clear. The Court is troubled by the lack of expert testimony presented by either party in this case to clarify the extent of property damage to the TTC's electrical system and the causal relationship between such property damage and Ryan's subsequent repairs. In the absence of such testimony, a factfinder will surely have difficulty allocating the settlement between covered and uncovered damages in this matter. However, the Court believes such factfinding is necessary in this case, making summary judgment for either party improper.[8]

---

[7]   For example, reasonable jurors could differ regarding the proper weight to afford the deposition testimony on which Everest relies heavily to establish its theory of the case. (*See, e.g.* Wiegert Aff. ¶ 8, Ex. 7 at 145-47, 174-75; *id.* ¶ 2, Ex. 1 at 118.) Similarly, jurors could weigh and evaluate the statements by Ryan's attorneys made in legal correspondence on which Everest relies to characterize the scope of the repair work and its relationship to the Feeder 1B/UPS-2 room damages. (*See* Wiegert Aff. ¶ 14, Ex. 13; *id.* ¶ 16, Ex. 15; *id.* ¶ 17, Ex. 16.)

[8]   Because the Court concludes that Ryan has not yet established that it is entitled to coverage under the policy by allocating the $7 million settlement between covered and

(Footnote Continued on Next Page)

## CONCLUSION

Ryan cannot establish coverage over the entire $7 million settlement simply because it followed an occurrence that led to property damage.  Similarly, material fact issues preclude Ryan from establishing a right to coverage over all of the repairs as consequential damages flowing from the underlying property damage at the TTC.  Allocation is necessary to determine what portion of the settlement can reasonably be attributed to covered damages—those Ryan became obligated to pay because of property damage.  The Court concludes that there is a genuine dispute as to this material fact.  Thus, neither Ryan nor Everest are entitled to summary judgment on the record before the Court.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. [21]) is **DENIED**.

2.     Defendant's Motion for Summary Judgment (Doc. No. [28]) is **DENIED**.


Dated:  January 8, 2016                          s/Donovan W. Frank
                                                 DONOVAN W. FRANK
                                                 United States District Judge

---

(Footnote Continued From Previous Page)
uncovered damages, the Court does not address the potential exclusions on which Everest relies to further challenge Ryan's right to coverage under the Everest policy.